# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID A. SPAW,                )
                              )
        Plaintiff,    )    2:07-cv-905
                              )
  v.                          )
                              )
MICHAEL J. ASTRUE,            )
                              )
        Defendant.    )

## MEMORANDUM OPINION AND ORDER OF COURT

**I.     Introduction**

Pending before the court are cross-motions for summary judgment based on the administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 8) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 11). The motions have been fully briefed and are ripe for resolution.

Plaintiff, David A. Spaw, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final determination of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner") which denied his application for disability insurance benefits ("DIB") under title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, and for supplemental security income ("SSI") under title XVI of the Act, 42 U.S.C. §§ 1381-1383f.

**II.      Factual and Procedural Background**

Plaintiff was born on May 8, 1965, and is classified as a "younger individual" pursuant to 20 C.F.R. §§ 404.1563, 416.963. Spaw has a high school education and past relevant work history as a machinist. He reported numerous other jobs, including nursing assistant, landscaping and an assistant to an insurance adjuster. Spaw stated that he lost his prior jobs due to absenteeism. The record reflects that Spaw was employed in 2003, 2004 and early 2005. His last day of work was May 5, 2005, which is the alleged onset date of his disability. Spaw meets the nondisability requirements for disability and was insured for benefits through the date of the decision of the Administrative Law Judge ("ALJ") on April 9, 2007.

Plaintiff alleges disability due to major depressive disorder and sleep apnea and obesity. Spaw has a long history of drug and alcohol abuse, domestic problems, anger management issues, and psychiatric care and counseling. Because Spaw alleges a disability onset date of May 5, 2005, the Court will focus on the medical record after that date. Plaintiff does not have any exertional limitations. Further, to his credit, the record reflects that Spaw has been clean from drugs and alcohol since 1999-2000. The notes of a counseling session on August 10, 2005 by Marija Cutlip, M.D., state: "He remains in full remission from alcohol dependence." R. 103. Similarly, Dr. Cutlip's notes dated September 26, 2006 state: "He is completing the seventh year of recovery from alcohol dependence." R. 173.

Spaw received psychiatric care from Chestnut Ridge Counseling Services starting in 2001. Spaw testified that he met with treating psychiatrist Dr. Cutlip approximately monthly

throughout the relevant time period. R. 218.[1] In the notes from an appointment on June 22, 2005, Dr. Cutlip noted that Spaw was doing relatively poorly and complained of lack of energy or motivation and profound daytime sleepiness. She adjusted his medications, which included celexa, lexapro, wellbutrin and trazodone, and discontinued seroquel. Spaw also had recently started an anti-cholesterol medication. R. 109. The same day, Spaw attended an anger management session with Robert Eby, LPC, in which he reported that he had been laid off from work and had had occasional verbal outbursts. R. 108. In a followup appointment on June 29, 2005, Spaw denied having any further anger outbursts. R. 106. During a counseling visit on July 6, 2005, Patsy Pasqualucci, RN, noted that since the change in his medications, Spaw had more energy and was feeling a lot better, and kept busy cutting the grass and working on cars. R. 104. On August 10, 2005, Dr. Cutlip noted that Spaw was "very positive today" and reported that he had been in "good emotional health" and had recently taken a family trip to Florida. R. 103.

After August 2005, there appears to be a gap in the medical record until November 1, 2005, when Spaw attended a therapy session with Ms. Pasqualucci. Spaw reported that the trazodone had ceased being effective for sleep in the last few weeks, but that he took seroquel (from a prior prescription) and was sleeping well. Spaw was tolerating his other medications well. R. 185.

On November 21, 2005, Roger Glover, Ph.D., a state agency non-examining physician, completed a Psychiatric Review Technique form which assessed Spaw's residual

---

[1]The record reflects appointments with Dr. Cutlip in June and August of 2005 and January, March, May, July and September of 2006.

functional capacity. R. 153-168. Dr. Glover recognized that Spaw had an affective disorder pursuant to Listing 12.04, namely a depressive syndrome. However, in evaluating the "B" criteria to determine functional limitations, Dr. Glover opined that Spaw had only mild restrictions in daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Dr. Glover further opined that the "C" criteria were not established. In completing the Mental Residual Functional Capacity Assessment, Dr. Glover did not determine that Spaw was "markedly limited" in any category. Dr. Glover found moderate limitations in Spaw's ability to understand and remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to respond appropriately to changes and to set realistic goals or make independent plans. Dr. Glover opined that Spaw was "Not Significantly Limited" as to the remaining categories. In summary, Dr. Glover opined that Spaw would be able to maintain regular attendance, concentrate, interact appropriately and function in production oriented jobs. Dr. Glover concluded that Spaw "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment."

Dr. Cutlip next met with Spaw on January 24, 2006. Spaw reported difficulties with self-worth and accomplishment as his five-year-old son was facing a difficult adjustment to his new school and had significant behavioral, attention, learning and medication management issues. Spaw, a single parent, was involved in appointments for evaluation of his son's problems. Spaw reported a relatively low mood, occasional bouts of depression and a chronic lack of energy. Dr. Cutlip noted that Spaw's recovery has been stable, that his mood was neutral and that he was in no acute distress. R. 183.

On March 7, 2006, Dr. Cutlip noted that Spaw stated that "he has been doing fairly well" and he was "overall in good shape." Spaw's son continued to have problems and remained the focus of his activities. Spaw denied any side effects from his medications other than increased daytime sleepiness and the need to take a nap occasionally. R. 182. On May 31, 2006, Dr. Cutlip noted that Spaw "has been doing relatively well" but continued to report fatigue, low energy and low drive. His mood was slightly dysthymic and he appeared to have a decreased energy level. Dr. Cutlip discontinued lexapro and started Spaw on effexor. R. 180. The same day, Dr. Cutlip completed a health-sustaining medication assessment form and an employment assessment form. Dr. Cutlip explained that the medications were necessary because Spaw was experiencing low mood, low energy, inability to sustain concentration, tolerate work-related stress or consistently execute any work tasks and opined that Spaw was temporarily disabled from May 31, 2006 to May 31, 2007. R. 169-171.

On July 11, 2006, Dr. Cutlip noted that Spaw was "rather impressed" with the effect of the effexor and had a "much better energy level." He was "very excited" to spend most of the summer at the beach with his son. His mood was pleasant. Dr. Cutlip's diagnosis was that Spaw's major depressive disorder was "near remission." R. 176.

On September 26, 2006, Dr. Cutlip noted that Spaw was doing well, was involved in caring for his son, denied side effects from the medications, appeared to be stable and continued to maintain a positive attitude. The followup appointment was set for "12 weeks with the nurse." R. 173.

On October 4, 2006, Pierre Edde, M.D., diagnosed Spaw with obstructive sleep apnea, noting that his score was consistent with severe daytime dysfunction. R. 191. Dr. Edde

5

recommended use of a CPAP machine. Spaw testified that the CPAP machine helped but that it was hard to get used to it. R. 230.

On November 6, 2006, Dr. Cutlip completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" (hereafter referred to as the "November 2006 Assessment"). R.188-189. This document forms the primary basis for Plaintiff's legal argument in this case. Dr. Cutlip stated that Spaw's Global Assessment of Functioning (GAF) score was 62. She opined that he had poor or no ability to "maintain attention for two-hour segment," "complete a normal workday and week without interruptions from psychologically based symptoms," "perform at a consistent pace without an unreasonable number or length of rest periods," "deal with normal work stress," "deal with stress of semiskilled and skilled work," work in unfamiliar places and stated that Spaw's ability to interact with the public was "unpredictable." Dr. Cutlip explained that "chronic recurrent mood and anxiety symptoms present continual sources of distraction, inconsistent attention span and inconsistent ability to cope with stress and maintain regular/consistent performance." Dr. Cutlip further stated that Spaw had a poor ability to maintain his level of coping with stress imposed by work stemming from recurrent anxiety/depression, and that he had a diminished ability to cope with unstructured, unknown, unfamiliar environments and could not "predictably, reliably, consistently act/behave/function in view of chronic recurrent mood [disorder]." Cutlip opined that Spaw would be absent from work more than three times per month.

In August 2005, Spaw protectively filed applications for DIB and SSI. The Commissioner denied the applications initially and pursuant to a pilot program, Spaw was permitted to proceed directly to a review of that denial by an ALJ. An administrative hearing

was held on December 15, 2006. At the hearing, the ALJ questioned Spaw about his work history and daily activities. Spaw stated that he did not get out and travel or take trips. R. 232. When pressed about the physician notes reflecting his summers in Florida, Spaw stated: "I forgot." R. 233. The ALJ asked the VE to opine as to whether there would be work available with the following criteria: no detailed or complex instructions, no close concentration or attention to detail for extended periods of time, no fast-paced or assembly line work, no work with the general public, no more than occasional changes in the work setting, and no requirement to set workplace goals. The VE opined that such a person could not perform Spaw's prior work as a machinist, but could perform other jobs, such as kitchen helper, machine feeder, packer, mail clerk, assembler and document preparer. The VE opined that employers generally would tolerate up to two days per month of absenteeism. Spaw's counsel then asked the VE to assume all of the limitations identified by Dr. Cutlip in the November 2006 Assessment. The VE opined that under that hypothetical, no work would be available.

   After the administrative hearing, Spaw's claim was denied in a written decision dated April 9, 2007. R. 11-20. Under the five-step sequential analysis used to determine disability, the ALJ determined at step one that Spaw was not engaging in substantial gainful activity. At step two, the ALJ found that he had the severe impairments of major depressive disorder and sleep apnea with obesity. At step three, the ALJ concluded that the impairments did not meet or equal one of the "listed impairments" set forth in 20 C.F.R. 404 Subpart P, App. 1. At step four, the ALJ determined that Spaw did not have the residual functional capacity to return to his past work as a machinist. However, at step five, the ALJ concluded that the government had met its burden to show that Spaw had the residual functional capacity to

perform other work that exists in the national economy. In the written decision, the ALJ specifically explained the reasons why he gave Dr. Cutlip's assessment little weight – namely that it was inconsistent with her own GAF assessment and treating notes – and why he found Spaw's testimony not to be totally credible. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. The parties agree that the case is properly before this Court.

**III.     Legal Analysis**

   A.     Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g), 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. *Id.*; *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment,

(4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920; *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for benefits under the Act, a claimant must demonstrate that there is some medically determinable impairment that prevents him or her from engaging in any substantial gainful activity expected to result in death or last for a continuous period of at least twelve months. *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423 (d)(1), 1382(c)(3).

This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,

> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in

the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

**B.     Discussion**

In this appeal, Plaintiff contends that the decision to deny benefits is not supported by substantial evidence because: (1) the opinion of Dr. Cutlip, his treating physician, is entitled to greater weight; (2) Spaw is entitled to greater credibility; and (3) the hypothetical propounded to the vocational expert ("VE") did not accurately portray the extent of Spaw's limitations. These arguments will be addressed seriatim.

1.     Dr. Cutlip's Opinion Regarding Employability

Plaintiff contends that the ALJ improperly refused to give controlling weight to the limitations identified by Spaw's treating physician, Dr. Cutlip, in the November 2006 Assessment. The Court does not agree with Plaintiff. The determination of whether a person is "unable to work" for the purpose of the Act is reserved to the Commissioner and the opinion of a treating physician on this ultimate issue is entitled to no special significance. 20 C.F.R. §§ 404.1527(e), 416.927(e). The ALJ did recognize that Dr. Cutlip was a treating physician and stated that he did consider her opinion in reaching his decision. The ALJ then thoroughly and properly explained that the November 2006 Assessment was not entitled to controlling weight because it was not well supported by medical evidence and was inconsistent with other substantial evidence in the case record. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Specifically, the ALJ pointed to the contradictions between the November 2006 Assessment

and Dr. Cutlip's *own* GAF score and treatment notes. A GAF score of 62 indicates only mild impairment in social or occupational functioning. Similarly, Dr. Cutlip's most-contemporaneous treating notes (on September 26, 2006) reflected that Spaw was doing well, was involved in caring for his son, was not experiencing side effects from the medications, appeared to be stable, and continued to maintain a positive attitude. R. 173. In July 2006, Dr. Cutlip diagnosed Spaw's major depressive disorder as "near remission" and the notes of the September visit appear to be consistent with that diagnosis. A followup appointment was not set for three months – substantially after completion of the November 2006 Assessment. Dr. Cutlip's treatment notes do not support the substantial limitations articulated in the November 2006 Assessment. In summary, there is substantial evidence to support the ALJ's well-considered decision to discount the November 2006 Assessment completed by Dr. Cutlip.[2]

2. Spaw's Credibility

Plaintiff also challenges the finding of the ALJ that Spaw's testimony regarding his daily activities was not totally credible. Plaintiff recognizes that the ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence. Plaintiff's Brief in Support of Motion for Summary Judgment at 11. However, Plaintiff contends that his description of his daily activities is supported by the record. In essence, Plaintiff contends that his daily activities are sporadic and transitory and do not demonstrate an ability to engage in substantial gainful activity. The Court

---

[2]The Court notes that the ALJ gave significant weight to, but ultimately disagreed with, the opinion of the state agency physician, Dr. Glover, that Spaw had only mild limitations in social functioning. The ALJ did not simply credit Dr. Glover's opinion rather than that of Dr. Cutlip.

cannot agree with Plaintiff. As an initial matter, the ALJ did accept many of the symptoms and limitations articulated by Spaw. The ALJ then thoroughly explained the reasons why he found Spaw's testimony to be less than fully credible. R. 16-17. In particular, Spaw had been untruthful in testifying that he never travels, before admitting to taking a lengthy trip to Florida. R. 233. Similarly, in contrast to his hearing testimony, the treatment notes from July 2005 reflect that Spaw kept busy cutting the grass and working on cars. *Compare* R. 104 and R. 232. In addition, the ALJ noted that Spaw was very active, as a single parent, in the care of his son, including taking him to appointments, and that his energy level improved such that he was able to move into a new house.[3] In sum, there is substantial evidence to support the analysis and conclusion of the ALJ that Spaw's testimony at the hearing was not totally credible.

3. The Hypotheticals Posed to the Vocational Expert

Finally, Spaw challenges the accuracy of the hypothetical posed to the VE. A vocational expert's testimony about available jobs that Plaintiff could perform despite his limitations constitutes substantial evidence if the hypothetical accurately portrays all of the claimant's impairments. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). In answering the hypothetical posed by the ALJ, the VE testified to several examples of jobs that Plaintiff could perform, such as kitchen helper, machine feeder, packer, mail clerk, assembler or document preparer. In response to a question from Plaintiff's counsel, the VE testified that if a person had the limitations set forth in Dr. Cutlip's November 2006 Assessment, no jobs would

---

[3]To the extent that Spaw's limitations resulted from sleep apnea (*see* R. 191 - Dr. Edde noted that Spaw's score was consistent with severe daytime dysfunction), the record reflects that the CPAP machine was helping to ameliorate those symptoms. R. 230.

be available. R. 239. For the reasons set forth above, there is substantial evidence to support the ALJ's decision to discount Dr. Cutlip's opinion. The ALJ properly explained why these additional limitations were not supported by the record, and therefore not included in the hypothetical he proffered to the VE, and his conclusion is supported by substantial evidence. This Court thus finds that the hypothetical posed to the VE fairly and reasonably reflected Spaw's limitations and that the RFC assessment for Plaintiff was not in error.

**IV.     Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that he is able to perform a range of work that is available in the regional and national economy.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID A. SPAW, | ) | |
| Plaintiff, | ) | 2:07-cv-905 |
| v. | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 19th day of August, 2008, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1. Defendant's Motion for Summary Judgment (Document No. 8) is **Granted.**

2. Plaintiff's Motion for Summary Judgment (Document No. 11) is **Denied**.

3. The Clerk will docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: Robert W. Gillikin, II, Esquire
Email: rgillikin@peircelaw.com

Lee Karl, Esquire
Email: lee. karl@usdoj.gov